Lewis A. WILLEY, ADM'R *v.* V. A. MURPHY

5-5097                                  448 S. W. 2d 341

Opinion delivered December 22, 1969

*J. Marvin Holman,* for appellant.

*Williams & Gardner,* for appellee.

CARLETON HARRIS, Chief Justice. This litigation involves deposit certificates in two different financial institutions. The First Federal Savings and Loan Association of Fort Smith filed an interpleader action in the Johnson County Chancery Court against V. A. Murphy, and Lewis A. Willey, Administrator of the Estate of Pearl Bailey, the association asking the court to determine the ownership of Certificate No. N-6319 in the amount of $8,000.00. In answer, both Murphy and Willey filed pleadings asserting ownership of the certificate. The Peoples Bank and Trust Company of Russellville likewise filed its Bill of Interpleader in the Johnson County Chancery Court, asking the court to determine the rightful owner of two certificates, one for $2,700.00, and the other for $800.00, making a total of $3,500.00. The cases were consolidated for trial, and heard by the court. At the conclusion of the trial, the court decided the Federal Savings and Loan Association case in favor of Murphy, but decided the companion case, instituted by the Peoples Bank and Trust Company, in favor of Willey, as administrator. Willey appeals the decision in favor of Murphy, and Murphy appeals the decision in favor of Willey. We discuss first the disposition of the Fort Smith case.

John R. Tinsley, employed by the First Federal

Savings and Loan Association as Secretary, identified the certificate issued for $8,000.00 to Pearl Bailey or V. A. Murphy. Mr. Tinsley testified that he did not remember under what circumstances the certificate was issued, since it was not prepared under his direction. Subsequent proof reflected that Mrs. Bailey and Mr. Murphy had gone to the savings and loan association office on a Saturday morning, and Mr. Tinsley testified that, if the transaction occurred on a Saturday, the card would have borne the date of the following Monday. He did remember a couple coming to the office on Saturday, May 22, but did not recall their appearance. However, he had the deposit slip, which was in his handwriting, and the signature card for the account. The card, dated Monday, May 24, 1965, was a joint account card designating Mrs. Bailey and Murphy as joint tenants with right of survivorship. Dividend checks bore both names, and were mailed to Route 2, Clarksville, Arkansas, Mrs. Bailey's address. There is no evidence whatsoever that the provisions of Ark. Stat. Ann. § 67-1838 (Repl. 1966) were not complied with. The pertinent portion of that statute provides as follows:

"If the person opening such savings account fails to designate in writing the type of account intended, or if he designates in writing to the association that the account is to be a 'joint tenancy' account or a 'joint tenancy with right of survivorship' account, or that the account shall be payable to the survivor or survivors of the persons named in such account, then such account and all additions thereto shall be the property of such persons as joint tenants with right of survivorship."

The attack made by Willey is based, not on any failure to comply with statutory requirements, but rather on the contention that Murphy exerted undue influence upon Mrs. Bailey in order to persuade her to deposit this money in a joint account with him; further, that the deposit in the joint account was a gift from Mrs. Bailey to Murphy in contemplation of marriage,

and should be returned to the donor under the circumstances herein. It is also asserted that the deposit was made jointly with Murphy for the purpose of convenience.

We do not agree with any of these contentions. Murphy had formerly been married to Mrs. Bailey's sister, May Quatum, but the parties were divorced in about 1961, and he had accordingly been acquainted with Mrs. Bailey prior to her second husband's death.[1] Murphy himself testified that he lived with Mr. and Mrs. Bailey for a while, and would calculate interest for Bailey on some of the notes and loans held by the latter. The testimony reflected that Mrs. Bailey was 81 years of age at the time of her death, and appellant's testimony is directed to a melange of contentions. Evidence was offered that Mrs. Bailey was old, and apparently becoming forgetful and senile; that she depended upon Murphy for advice, the latter, it is asserted, taking advantage of a confidential relationship, and thus being able to defraud her of her money.

Bud Wise, a neighbor, testified that, after Mr. Bailey died, Mrs. Bailey brought papers to his home that she didn't understand. and asked his advice. He mentioned a couple of mortgages, and said she asked his opinion of what should be done. Wise stated that she had given him money to hold for her in the past, and on one occasion, had brought $1,300.00 in cash to his home, together with papers, leaving them with him while she took a trip to California; that he kept this property from August until October. He also said that he accompanied her when the money was originally placed in the bank at Russellville.[2] Referring to questions asked by the banker, Wise said:

---

[1] Mrs. Bailey had previously been married to Lee Feltner, whose testimony will be subsequently discussed.

[2] Mrs. Bailey had taken out the $2,700.00 certificate in October, 1964, and this is the occurrence referred to by Wise. The $800.00 certificate was issued to her in January, 1966.

"Oh, yeah, well he asked her did she have a will made. First said, asked her did she have a husband and she told him no. He says you have any children and she told him no. He said well have you got a will made and she said no, I haven't. And he said well you oughta have someone on here with you. And she spoke up and said what about my neighbor here. Said he lives right next to me. And I said no. And this banker spoke up and said I would be just like your neighbor. He said the thing for you to do is to have you a will made out if you haven't got any folks to leave it to. Leave it to a church and have you a will made."

Wise also stated that at another time, she had left $700.00 in cash with him overnight; however, he said that she did not seek his advice during the last two years of her life. The witness stated that he saw Murphy at the Bailey home many times, and that Murphy had lived there a couple of months. As to any planned marriage, Wise testified:

"Well, the only thing she told me one time she said to me she said, well said I don't know what the neighbors thinks about him a coming and staying at nights, but says it don't make no difference. Said we are going to get married anyhow."

When asked when this conversation took place, the witness first said, "A couple of years ago," but then stated:

"Well it could have been. It could have been less. I'm pretty bad about remembering things."

Lee Feltner, 82 years of age, Mrs. Bailey's first husband, testified that they were married in 1905, and had two children, both having died, and there was one grandchild, James Feltner. The witness stated that the last time he had talked with Mrs. Bailey was six or seven years before her death. He said that his present wife had made application for Social Security, and needed a

copy of his divorce decree, but the clerk could not find it in the records. He then went to see Mrs. Bailey, and asked if she had gotten the divorce, and she replied that she didn't; however, the next morning the clerk advised that he had found the record of the divorce which had been granted to Mrs. Bailey.[3]

James Feltner, Jr., the grandson, and the only heir of Mrs. Bailey, lives in Oxnard, California. He testified that he last saw his grandmother about three years before her death, while visiting back in Arkansas, staying at her home part of the time, and with his grandfather part of the time. He said that he wrote to Mrs. Bailey and sent her presents at Christmas:

"* * * I stayed with her when I was a boy and I guess I was so little I got homesick for California and she said uh—I told her I wanted to go home to California. I was hot and wasn't used to the weather nor to her type of cooking. She said, 'Well, Jim, we don't have the money to send you home.' And I says, 'Well, you've got a cow. You can sell that cow and get me a train ticket and send me home.' So she went—had a suit made of my dad's—had it cut down, made me a suit, and give me the new suit and I still wanted to go home. So I didn't eat well at that time. The only thing I could eat was tomatoes and she would put them on ice and feed me those tomatoes with salt. She took me to a doctor and the doctor said well this boy is homesick. and he's not going to eat. And I just wanted to go home."

Feltner testified that Mr. Murphy visited in the home during the time he was back on the visit, stayed one or two nights, and had Thanksgiving dinner with the witness and his grandmother; that she indicated, by remarks, that Murphy stayed there quite a bit. As to her mental condition, the witness stated:

"Well, I would say she was getting old. She was—

[3]The divorce was granted in 1926.

Well, old people—I wouldn't say that their mind is failing, but I wouldn't say that of my grandmother. I would say that—I would say that she was getting old and forgetful and I don't know any polite term for it, but I'd call it senile.''

Feltner reiterated his thought that she was senile, stating:

''Yes, sir, because she was scared to ride in the truck with me and I remember we was going down the road and we come to a hill and she couldn't see over the hill, and I guess she got the idea that it was just going to drop right off into the river. We were down close to the river.''

The grandson testified that, after Mrs. Bailey's death, when he had returned from the funeral, he made a search of the house, and found numerous letters to his grandmother from Murphy. He said he found them at various places, the attic, shoe boxes, bureau drawers, and some thrown in the corner. Twenty-five dollars in money was found; also the certificates of deposit from the bank at Russellville. Feltner stated that his grandmother had told him at the time of his visit that Murphy had taken care of her business affairs for the last four or five years; he subsequently changed that statement, and said that he meant ''three years.''

John Marlar, who lived 2½ miles north of Mrs. Bailey, and was related by marriage, testified concerning Mrs. Bailey's physical and mental health:

''Well, since Bailey died, she just didn't seem like herself. She just went down so fast.''

Several witnesses testified on behalf of appellee. Murphy, 75 years of age, testified that he and Mrs. Bailey would have been married at the end of the previous year, except for her death. As to the certificate

of deposit, he testified that he and Mrs. Bailey went to the First Federal Savings and Loan Association office in Fort Smith, and that all directions (as to how the account should be set up) were given by Mrs. Bailey; he testified that he had an account in Jonesboro at the Citizens Federal Building and Loan in the amount of $1,500.00, all of the money being his, but the account being in the joint names of the witness and Pearl Bailey. Murphy testified that he paid the bill for Mrs. Bailey's funeral.

Mrs. J. E. Goodin, a neighbor, testified that she saw Mrs. Bailey every day after Mr. Bailey died; that she would drive Mrs. Bailey to town, and to the grocery store. She said that Mrs. Bailey was able to remember events from day to day, and that she mentioned loans that had been made to persons from whom she was collecting interest. Mrs. Goodin testified that Mrs. Bailey left her purse with the witness when it became necessary to go to the hospital, telling her to take care of it. She also said that she had been told that her neighbor and Mr. Murphy were planning to get married. Mrs. Goodin was familiar with the Fort Smith savings account, Mrs. Bailey having told her about it; the fact that it was a joint account was not mentioned, but the dividend check was made to the two.

Truman Owens, another neighbor, testified that he noticed nothing unusual in conversation with Mrs. Bailey; that he would say she had a good memory to be as old as she was. In rebuttal, Mrs. Ruby Willey, a beautician whose former husband was a nephew of Mrs. Bailey, testified that she had fixed Mrs. Bailey's hair for a long number of years, and that following her husband's death, Mrs. Bailey was lonely, and seemed to be "real miserable." Nothing was said to indicate there was anything wrong with Mrs. Bailey, mentally.

We think the proof falls far short of establishing that Murphy stood in a confidential relationship and

took advantage thereby. There is nothing in the record to show one affirmative act by appellee of advising, or suggesting to Pearl Bailey where, and in what manner, to deposit her money. In letters that were found and introduced, there are no suggestions for a joint account. For that matter, it appears there were also others that Mrs. Bailey must have had confidence in, since she left money and possessions with both Mr. Wise and Mrs. Goodin. We see nothing unusual in the fact that an elderly woman, or for that matter, anyone, who lives alone, seeks advice in business matters from friends, particularly when the nearest relative is hundreds of miles away in California, and that relative has only been in the home twice in 13 years. The law, of course, does not frown upon the seeking of advice from friends— nor does it prohibit the giving of advice. It is the over- reaching—taking advantage of the trust of another— that is condemned. There is no evidence here that Mrs. Bailey was overreached—or that she was talked into do- ing something that she did not want to do. Certainly, it is not established that Murphy never intended to marry Mrs. Bailey and was just "leading her on." The nearest evidence in support of this contention was the testimony of Wise, heretofore mentioned. While there may be those who condemn the marriage of people in advanced years, this is certainly the prerogative and right of every single person, and such marriages occur every day throughout the country.

It will be noted that the majority of appellant's wit- nesses are related or connected in some manner with Mrs. Bailey's family, but at any rate the proof is in- sufficient to establish the contention made by Willey in his appeal.

The issue on the appeal by Murphy with regard to the certificates issued by the Russellville bank is a much closer question. Donald Barger, Chairman of the Board and Chief Executive Officer of the Peoples Bank and Trust Company of Russellville, testified that the cer-

tificates of deposit were stamped by the bank "as joint tenants with right of survivorship and not as tenants in common." Barger said that he was working at the bank one Saturday, and someone kept knocking on the door until he finally let them in. A man and woman came in, the woman introducing herself as Pearl Bailey, and introducing the man with her as Mr. Murphy. Barger said that she told him she wanted the certificates issued in both names, and he assumed that she wanted it in a normal wording of a joint account with right of survivorship. Barger testified that he misplaced the name of the man, and wrote Mrs. Bailey a letter on February 20, 1968, asking for the name. A copy of this letter was introduced into evidence. The witness then said that he received a letter from Mrs. Bailey directing the issuance of the certificates in her name and the name of Mr. Murphy. Apparently, he thought that he had the letter, but it could not be found, and accordingly, was not offered in testimony. A copy of the reply to the Bailey letter was then offered in evidence. In this reply, Mrs. Bailey was advised that:

> "* * * Both these certificates have now been changed to a joint ownership form as follows: Mrs. Pearl Bailey or V. A. Murphy, as joint tenants with right of survivorship and not as tenants in common.

> "The two certificates referred to above are returned herewith and we trust you will find them changed to your satisfaction. If for any reason there is any misunderstanding about the form of registration, please contact us promptly. * * *"

Barger identified V. A. Murphy as the man who accompanied Mrs. Bailey on the Saturday morning. Neither a signature card for the account nor a signature card signed by Murphy, was found. The trial court held that the statute was not complied with, and that the two certificates involved were not issued in the form required by law to vest title in Murphy as survivor. The

pertinent portion of the statute, Ark. Stat. Ann. § 67-552 (Repl. 1966), reads substantially like the previous statute discussed in the Fort Smith case:

"If the person opening such account, or purchasing such certificate of deposit, designates in writing to the banking institution that the account or the certificate of deposit is to be held in 'joint tenancy' or in 'joint tenancy with right of survivorship,' or that the account or certificates of deposit shall be payable to the survivor or survivors of the persons named in such account or certificate of deposit, then such account or certificate of deposit and all additions thereto shall be the property of such persons as joint tenants with right of survivorship."

In *Cook* v. *Bevill*, 246 Ark., handed down May 5, 1969, 440 S. W. (2d) 570, we said that there must be a substantial compliance with the "designate in writing" requirements of the act in order to effect survivorship. Under the testimony herein, we cannot find substantial compliance. This is not because the request to add Mr. Murphy's name was by letter, rather than by the signing of a signature card; nor is our finding based on the fact that Mrs. Bailey's letter had been lost. Rather, the testimony makes clear that the writing (letter) signed by Mrs. Bailey did not request that the certificates be issued in "joint tenancy," or "joint tenancy with right of survivorship."

From the record:

"Q. And what she furnished you then was just the man's name?

A. Right.

Q. Was there anything else on that directing the type of account for you to set up?

A. No."

The trial judge held correctly.

Affirmed.